Leona KEELING, Petitioner,

v.

STATE INDUSTRIAL COURT, Artemis Manufacturing Company, American Mutual Liability Insurance Co., Respondents.

No. 40290.

Supreme Court of Oklahoma.

Feb. 11, 1964.

Claud Briggs and Carrol Womack, Oklahoma City, for petitioner.

Donovan & Rogers, Tulsa, for respondent, Artemis, Inc.

JOHNSON, Justice.

Leona Keeling, the petitioner herein, on July 17, 1961, as claimant in the State Industrial Court, filed therein her first notice of injury and claim for compensation. Thereafter, pursuant to regular proceedings, the Industrial Court denied claimant's claim for compensation; finding that claimant did not sustain an accidental personal injury or accidental personal injuries, as alleged in her claim, which would entitle her to compensation benefits under the Workmen's Compensation Law. Claimant has thereupon brought this proceeding against the employer, Artemis Manufacturing Company, and its insurance carrier, American Mutual Liability Insurance Company, seeking a review of the order denying the claim.

The sole question here for review is whether or not the evidence is sufficient to support the Industrial Court's order and finding that the claimant did not sustain an accidental injury which would entitle her to compensation benefits under the Workmen's Compensation Law.

The record discloses that petitioner began work for respondent employer as a seamstress piece worker in September, 1960. She started on numbered jobs 703 and 705, working thereon until approximately three months prior to June 23, 1961, at which time she was placed on job number 704, which consisted of sewing the collars and cuffs on lined quilted dusters. Each job number had a minimum quota to be met which regulated the base pay of the employee. If the quota was exceeded, the employee received additional compensation in relation to the number of pieces exceeding the base quota. Claimant had no trouble making and exceeding her quota in either job 703 or 705. In job 704 she was seldom able to make the base quota, and at such times as she was able to so do, her work was inferior, would fail to pass inspection and would have to be redone by her.

She testified that she sat in such a position that she was in a strain. She was unable to say how long she carried on this work, but thinks it was two or three months. On June 5, 1961, she went home for lunch. When she returned she became so nervous and had pain and had to sit with head down to see what she was doing. Her head began to hurt, so she went home. This was between 1:30 p. m. and 2:00 p. m. At home she went to bed. She did not see a doctor at this time. She was off from work a couple of days and then went back. She complained to the union representative. Between June 5th and June 23rd she continued to have head pains. On the 23rd she left the plant in tears, and on advice of the union representative she went to Dr. J. He put her in the hospital for two or three days. She went home after that. Sometime later she went back to the hospital. She saw Dr. C and Dr. S.

It is obvious that such testimony standing alone does not sustain the occurrence of an "accidental" injury required by statute.

We next turn to the testimony of the physicians. The first of these was Dr. S., a neurosurgeon. In his deposition are found the following quotations:

"Q. And you are well acquainted with the history of her case?

"A. Yes.

"Q. You wrote a report on the date of August 7, 1961, which I am handing you, and ask the reporter to mark it for identification. Now, I will ask you to look at that and ask you if that is the original report with your signature attached.

"MR. DONOVAN: We have no objection to the report.

"A. This is the original report addressed to Mr. Wilhite on August 7, 1961.

"Q. Along with the history you have recited there she testified she was under severe strain during a period of time prior to her onset,—to

the onset of her condition, would that conform with your history?

"A. She stated that after she was transferred from one job to another job she developed nervous strain, I have no history of nervous strain prior to the transfer.

"Q. Now, Doctor, you expressed an opinion in this to the effect that the strain and work she was required to do brought on the onset of her condition, is that correct?

"A. We stated as far as the history obtained it was possible to elicit, assuming she had no previous trouble as stated in the history, it, it was our opinion that the nervous tension that led her to be hospitalized was due to nervous tension as a result of a change of job.

"Q. Would that be what you call continuous traumatic assault of the nervous system?

"MR. DONOVAN: To which we object, it is leading and suggestive.

"Q. (By Mr. Briggs) Tell us whether or not the history indicated anything of that nature, please, sir?

"A. We felt that the history indicated that there was present nervous tension, worry and insecurity, a constant trauma to the nervous system.

"Q. Was that, in your opinion, the cause of the development of her disability?

"A. It was the cause of the development of the disability that led her to be hospitalized."

* * * * * *

"Q. Doctor, we have a situation where a lady, then, is building up nervous tension by reason of mental apprehension and worry, is that correct?

"A. That is correct."

* * * * * *

"Q. And you took x-rays of her?

"A. Yes.

"Q. And the x-rays were normal?

"A. The x-rays were normal as far as any trauma or injury was concerned?

"Q. And of course it was consistent with her history?

"A. Yes.

"Q. You also then ran an encephalogram?

"A. Yes.

"Q. That also was normal?

"A. The electroencephalogram, as I recall, was normal.

"Q. So that the primary job you found was that this lady was inclined to worry and because she worried she couldn't do the job that was assigned to her?

"A. I would have to rephrase that sentence because I would have to answer 'no' to that particular phrasing, I would have to say that she had insecurity on the new job that produced anxiety and frustration because she wasn't able to do it as well, and because of this she developed nervous tension."

* * * * * *

"Q. You did recommend a psychiatrist, did you not, Doctor?

"A. Yes, a psychiatrist saw her.

"Q. Who was that?

"A. Dr. Milford Ungerman.

"Q. Did he suggest any treatment?

"A. Yes.

"Q. What was that?

"A. Medical treatment, primarily, and counsel.

"Q. Medical treatment, would that be in the nature of tranqualizing drugs and sedatives to quiet her anxieties?

"A. Yes."

\* \* \* \* \* \*

"MR. DONOVAN: Doctor, she had no nerve injury?

"THE WITNESS: She had no nerve injury per se.

"MR. BRIGGS: You mean no physical damage from outer force to her nerves?

"THE WITNESS: That is correct."

Dr. I. made a written statement as follows:

" \* \* \*

"Dear Mr. Donovan:

"The above named patient was examined in this office on February 20, 1962. At that time I was given the history of her becoming ill on June 24, 1961. Apparently this patient at that time developed vomiting, headache and neck pain. This occurred while she was sitting in a strained position at a sewing machine. She has subsequently been seen by numerous doctors including Dr. Averill Stowell, Dr. John Coates and Dr. Milford Ungerman. The patient reports to me that she has been given a diagnosis of having sustained a nervous breakdown. She feels that this is related to the stress and strain of her job at the sewing machine. She specifically relates that this injury occurred while she was sewing a collar on a garment.

"It is my recommendation that this patient be examined more thoroughly and from a more detailed fashion by a psychiatrist and in this regard I suggest that she be seen by Dr. Arnold Ungerman. It is my own personal feeling that people do not develop a nervous breakdown so suddenly and that the factors at the moment are probably not too important to the relation of the overall picture. By this, I mean that the important factors which ultimately produce a nervous breakdown have very likely been in existance for a period of several months to a few years. I feel that this is a most unusual situa-tion to be attributable to the stress and strain of her job to the exclusion of other factors. \* \* \*"

These were the only physicians who testified, and, as will be seen, their conclusions were not in conflict.

 In this jurisdiction it seems settled that where a mental disorder is the natural consequence of an accident which is compensable under the Workmen's Compensation Act, the claimant should be compensated. See Rialto Lead and Zinc Co. v. State Industrial Commission, 112 Okl. 101, 240 P. 96, 44 A.L.R. 494. However, the interpretation of the phrase "an accidental personal injury" as applied to the facts here has not been declared. (See 85 O.S. 1961 § 3) This court, however, has established certain definite criteria by which this phrase in the statutes is to be interpreted. In the case of Phillips Petroleum Co. v. Eaves, 200 Okl. 21, 190 P.2d 462, this court held that a back injury which was the result of stooping over in furtherance of employer's business did not constitute an accident. Again in Hanes v. Magnolia Pipe Line Co., 194 Okl. 657, 154 P.2d 53, the court said that it is essential that a disability be the result of an accidental injury before any award could be made. Again, the court said in Andrews Mining and Milling Co. v. Atkinson, 192 Okl. 322, 135 P.2d 960, that an accident within the Compensation Law must arise by some definite event, date of which can be fixed with certainty. In National Biscuit Co. v. Lout, 179 Okl. 259, 65 P.2d 497, we held that a disability is not compensable unless it occurs as the result of accidental injury.

An exhaustive search of the authorities from other courts reveals few situations comparable to the one at bar. In 29 A.L.R. at page 511, there appears in the text the following quotation:

" \* \* \* A nervous condition dependent upon poor posture of the body, in our opinion, does not constitute a commonly known and well-recognized personal injury consequent upon employment. \* \* \*"

There is a recognizable distinction between a physical injury occasioned by improper posture and a disease produced by improper posture. This must be borne in mind.

In Pimental's Case, 235 Mass. 598, 127 N.E. 424, this court held that neurosis and neuralgia produced by the faulty posture of a cigar maker was not a "personal injury" within the Compensation Act.

In the case of In re Maggelet, 228 Mass. 57, 116 N.E. 972, the first paragraph of the syllabus reads:

" 'Neurosis' of the nerves supplying certain muscles resulting from a posture which causes a cigar maker 'to bend with shoulders forward,' so as to induce 'pressure on the brachial plexus,' is not a personal injury arising out of and in the course of his employment within the meaning of Workmen's Compensation Act (St.1911, c. 751), since a disease of mind or body which arises in the course of employment with nothing more is not within the act, but it must come from or by an injury, although that injury need not be a single definite act, but may extend over a continous period of time."

In this case the distinction between a disease produced by the posture and an actual physical injury is recognized. This distinction is commented upon in the case of Shoren v. United States Rubber Company, 87 R.I. 319, 140 A.2d 768, where in the opinion appears the following:

" 'A high degree of discrimination must be exercised to determine whether the real cause of an injury is disease or the hazard of the employment. A disease, which under any rational work is likely to progress so as finally to disable the employee, does not become a "personal injury" under the act merely because it reaches the point of disablement while work for a subscriber is being pursued. It is only when there is a direct causal connection between the exertion of the employment and the injury that an award of compensation can be made.' This distinction was more clearly marked out and compensation denied in Maggelet's Case, 228 Mass. 57, 116 N.E. 972, 974, L.R.A. 1918F, 864. The act, the court therein observed, 'awards compensation for disease when it rightly may be described as a personal injury. A disease of mind or body which arises in the course of employment, with nothing more, is not within the act. It must come from or be an injury, although that injury need not be a single definite act but may extend over a continuous period of time. * * * The disease must be, or be traceable directly to, a personal injury peculiar to the employment."

The above conclusion is sustained by the case of Ada Coca-Cola Bottling Company et al. v. Snead et al., Okl., 364 P.2d 696, in which opinion we quoted from the case of Novak v. McAlister et al., Okl., 301 P. 2d 234, as follows:

" 'An injury does not arise out of the employment within the meaning of the Workmen's Compensation Law of this state, unless it results from a risk reasonably incident to the employment, and unless there is apparent to the rational mind, upon consideration of all the circumstances, a causal connection between the conditions under which the work is required to be performed and the resulting injury.' "

Further on in the opinion in the Ada case, we said:

"Stated another way, and in an overly simplified manner, the question is whether compensation is payable because a man 'worries' himself into a heart attack and death because his work-connected disability makes it impossible for him to work and provide for his family. No case has been called to our attention in which worry was a factor; however, it would seem that such is not a 'risk reasonably incident to the employment' within the meaning of

the quoted rule from Novak v. McAlister, supra."

■ That this determination made by the Industrial Court upon a question of fact is binding upon this court, if sustained by sufficient evidence, is beyond dispute.

In Goodell v. McNamar Boiler and Tank Company et al., Okl., 287 P.2d 444, we said:

"Whether a disability is attributable to an injury or other cause is a question of fact to be determined by the State Industrial Commission from the competent evidence adduced. Its determination of this fact will not be disturbed where reasonably supported by the evidence."

See also Acme Material Co. v. Wheeler, Okl., 278 P.2d 234; Merrill v. State Industrial Commission, Okl., 290 P.2d 1095; Eagle-Picher Co. v. Snyder, Okl., 311 P.2d 816; Uselton v. Bestway Freight Lines, Inc., Okl., 368 P.2d 860.

■ We are of the opinion that the finding of the Industrial Court was sustained by sufficient evidence, and that its judgment should be affirmed.

HALLEY, V. C. J., and DAVISON, WILLIAMS, JACKSON and IRWIN, JJ., concur.

BERRY, J., concurs specially.

BLACKBIRD, C. J., dissents.

BERRY, Justice (specially concurring).

It. is my opinion the order of the State Industrial Court should be affirmed, but that such affirmance should include recognition of matters hereinafter noted.

It is my belief that the claimant did not present sufficient competent evidence to sustain the burden of establishing that her disability arose out of and in the course of her employment within the meaning of the Workmen's Compensation Act. 85 O.S.1961 § 11, and Edmonds v. Skelly Oil Co., 204 Okl. 471, 231 P.2d 360.

Recognizably, the mind is the most complex part of the human anatomy. The causes of mental illness are many and varied, and often determination is speculative and then only after long observation and study by experts. The anxiety attendant upon maintaining one's position of employment may, under certain conditions, be considered together with other circumstances occurring during and in the course of employment which may combine to produce a compensable injury. However, I do not believe that this is true as concerns the present case. The only evidence bearing upon the question whether the necessary sitting position caused claimant's mental breakdown is too remote and too speculative to sustain the requisite burden herein.

In my view, in order for an employee to be compensated for (an injury resulting from) a nervous breakdown, would necessitate competent evidence to establish that the mental condition found to exist actually resulted from the particular employment. Evidence showing that the employment is merely incidental to the mental condition would not be sufficient. Such expert testimony would carry with it the degree of proof necessary to remove speculation as to the cause of injury.